# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**UNITED STATES
DEPARTMENT OF LABOR,**

CASE NO. 3:20 CV 718

Plaintiff,

v.

JUDGE JAMES R. KNEPP II

**WIRELESS BOYS, LLC, et al.,**

Defendants.

**MEMORANDUM OPINION AND
ORDER**

## INTRODUCTION

Plaintiff United States Department of Labor filed this action against Defendants Wireless Boys, LLC, and its managing member, Basam A. Sayed, for alleged failures to pay minimum and overtime wages, and the failure to make, keep, and preserve records, all in violation of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*. The parties filed competing motions for partial summary judgment. (Docs. 40, 42). Both parties filed respective opposition briefs (Docs. 44, 46), and replies (Docs. 47, 48).

For the reasons set forth below, Defendants' motion is denied, and Plaintiff's motion is granted in part and denied in part.

## BACKGROUND

Defendant Wireless Boys, LLC ("Wireless Boys"), is a Boost Mobile franchisee founded in 2011 by Defendant Sayed. (Sayed Depo., at 10).[1] Sayed is the owner of Wireless Boys. *Id.* Wireless Boys sold cell phones, wireless accessories, and cellular service for Boost Mobile. *Id.* at

---

1. Basam A. Sayed's deposition is located at ECF Doc. 37.

11. Wireless Boys had "hundreds" of employees between 2017 and 2020. *Id.* at 26. At one point, Wireless Boys had six or seven locations. (Schaefer Depo., at 11-12).[2] After this litigation arose, all Wireless Boys locations closed. (Sayed Depo., at 12-13). Defendant Sayed opened a separate business, XTR Wireless, LLC, in 2021, which currently has four stores. *Id.* at 13-14.

Sayed testified he maintained a limited role in Wireless Boys' daily operations. *Id.* at 11. His involvement was primarily limited to facilitating billing payments with the bank. *Id.* The only employees Sayed hired at Wireless Boys were general manager Rachel Kent, operations manager Brian Schaefer, and district manager Philandus Rideout. *Id.* at 15-16. Kent, Schaefer, and Rideout ("the managers") shared hiring and firing authority for all other Wireless Boys employees. *Id.* at 17-18. Sayed did not supervise the managers or any other employees. *Id.* at 23. Sayed negotiated the salaries of the managers. *Id.* at 28-29.

The general manager, Kent, oversaw Wireless Boys' stores and provided support for employees in the field. *Id.* at 19. The operations manager, Schaefer, ensured all promotions required by Boost Mobile were in place, and that all standards from Sprint, T-Mobile, DISH Network and all "middlemen" were followed. *Id.* Kent also acted as the general liaison between Wireless Boys and Sprint, T-Mobile, and Boost Mobile. *Id.* The district manager, Rideout, provided support for employees in the field and supervised multiple stores. *Id.* at 20.

The general manager was not required to seek approval from Sayed before making a business decision unless it was a "major financial decision", such as purchasing $5,000 speakers. *Id.* Decisions regarding employment were largely handled by Kent, who enforced the general guidelines set out by Boost Mobile. *Id.* at 22-23. The managers set employee schedules and made decisions related to salary deductions. *Id.* at 24-25. Sayed approved final payroll amounts but did

2. Brian Schaefer's deposition is located at ECF Doc. 38.

not have a role in determining paycheck totals for employees. *Id.* at 25-26. Sayed would receive a message from the managers listing the overall total for payroll, confirm sufficient funds were in the bank account, and then authorize payroll processing with the bank. *Id.* at 32. Rideout was responsible for inputting payroll information into ADP, a payroll company. *Id.* at 30-31. Sayed did not oversee Rideout's payroll processing. *Id.* at 30.

Store general managers were in charge of product inventory. *Id.* at 31. Wireless Boys used a time clock system for store clerks, which were recorded on the payroll service ADP. *Id.* at 31-32. Paycheck distribution was handled by the managers. *Id.* at 33.

Schaefer testified that he and Kent made employee hiring and employment policy decisions for Wireless Boys and that Sayed was not involved in those decisions. (Schaefer Depo., at 15). Schaefer stated he was responsible for setting employee schedules, approving overtime, and employee paycheck deductions. *Id.* at 15-16. Rideout was in charge of payroll, while Kent was charged with employee performance reviews. *Id.* at 16-17.

In response to a request for admission propounded by the Department of Labor, Sayed admitted that "[d]uring the period of March 1, 2017 through the present, [he] was involved in establishing, determining, implementing or approving Defendants' policies regarding the compensation of employees of Defendant Wireless Boys." (Doc. 47, at 104, Requests for Admissions No. 10).

Craig Spader, a wage and hour investigator with the DOL, took a personal interview statement of a purported Wireless Boys employee. (Doc. 41-2, at 95-96). The interviewee stated Sayed hired him, directed his work, and that Sayed controlled the hiring and firing decisions, approved deductions from employee paychecks, and that all decisions had to be approved by Sayed. *Id.* The name and signature of the interviewee are redacted in Plaintiff's exhibits. *Id.*

Investigation

In 2019, Defendants came under investigation by Plaintiff United States Department of Labor ("the Government") for complaints of minimum and overtime wage violations. (Spader Depo., at 30-31).[3] Spader was assigned to the investigation. *Id.* at 17. Prior to his investigation into Wireless Boys, Spader investigated Sayed in relation to an unrelated company, Haverhill Petroleum ("Haverhill"); that investigation uncovered violations of the FLSA. *Id.* at 25.

Minimum Wages

As part of his Wireless Boys investigation, Spader interviewed six individuals who were either employees, representatives, or former employees of Wireless Boys. *Id.* at 24. Spader also interviewed Sayed and reviewed records. *Id.* at 27. Spader testified the payroll records revealed minimum wage violations due to paycheck deductions that pushed employees' pay down to average below the minimum wage of $7.25 per hour. *Id.* at 31. According to Spader, deductions are permitted under certain conditions. *Id.* at 32. Sayed and former Wireless Boys operations manager Schaefer both testified paycheck deductions could have been from loans to employees, gas money, employees purchasing phones, uniforms, equipment, or employee theft. (Schaefer Depo., at 17-18); (Sayed Depo., at 36). Schaefer kept notes for any deductions in a pay period, and handed those notes to Rideout, who oversaw Wireless Boys' payroll. (Schaefer Depo., at 17). However, the majority of deductions were listed as "miscellaneous" on the payroll deduction line, and there is no evidence identifying the specific reason for each deduction. *Id.* at 30. Schaefer never discussed paycheck deductions with Sayed. *Id.* at 18. Sayed testified Rideout stole all of Wireless Boys' "financial records"; Sayed reported the theft to police. (Sayed Depo., at 50).

---

3. Craig Spader's deposition in located at ECF Doc. 39.

4

Overtime Wages

Spader testified the payroll records also showed overtime wage violations. (Spader Depo., at 42). Any hours worked over 40, in a seven-day period, must be paid at time and a half the regular rate of pay. *Id.* Spader stated the payroll records revealed overtime violations in several ways. *Id.* at 43. Some employees were paid "straight time" (regular rate of pay) for all hours worked, including those in excess of 40 hours per week. *Id.* Other employees' hours were impermissibly rounded down. *Id.* The records showed that if employees worked 80 hours or less over a two-week period (for example, 35 one week and 45 the next), they were paid straight time for all 80 hours where there should be five hours of overtime pay. *Id.* Finally, there was no overtime pay on some commission payments. *Id.* Spader compiled "back wage computation sheets" that purport to show these violations. *Id.* at 44.

Spader also testified the payroll records indicate some employees were misclassified as exempt. *Id.* at 47-48. The purportedly misclassified employees were paid below a guaranteed salary of at least $455 per week. *Id.* at 50. According to Spader, exempt employees should be paid the same weekly wage regardless of hours worked. *Id.* at 51. Because some employees' pay fluctuated below the set salary, they are not exempt, and thus should be entitled to overtime pay when working more than 40 hours in a week. *Id.* at 50-51.

Record Keeping

Wireless Boys used a computer system to track employee time records. *Id.* at 54-55. Employees inputted start and end times on a daily basis. *Id.* at 55. Time records collected hours worked but the records did not identify "total weekly hours". *Id.* at 56. However, Spader was able to determine the total weekly hours using the data collected from the system. *Id.*

**STANDARD OF REVIEW**

Summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

This burden "may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmoving party must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. Further, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *See* Fed R. Civ. P. 56(c)(3) (noting the court "need consider only the cited materials").

Courts "apply the same standard in reviewing decisions on cross-motions for summary judgment, evaluating each motion on its own merits." *Retail Ventures, Inc. v. Nat'l Union Fire Ins. Co.*, 691 F.3d 821, 826 (6th Cir. 2012).

**DISCUSSION**

The Department of Labor brings three claims against Defendants for alleged violations of the Fair Labor Standards Act ("FLSA"): (1) failure to pay minimum wages; (2) failure to pay

overtime wages; and (3) failure to make, keep, and preserve records. *See* Doc. 1. The parties filed competing motions for summary judgment. (Docs. 40, 42).

Defendant Sayed moves for partial summary judgment arguing he is not an employer under the FLSA and therefore cannot be held individually liable for any violations thereof. *See* Doc. 40, at 7-8. All Defendants move for summary judgment on the statute of limitations, arguing Plaintiff failed to produce evidence which shows Defendants "willfully" violated the Act, thus the proper statute of limitations period is two years instead of three. *Id.* at 8-9. Defendants also move for summary judgment on the minimum wage and record keeping claims. *Id.* at 9-12.

The Government moves for partial summary judgment in its competing motion (Doc. 42) on the following issues: (1) Wireless Boys is a covered enterprise under the FLSA (*id.* at 18); (2) Sayed is an employer under the FLSA (*id.* at 18-19); (3) Defendants violated the FLSA minimum wage by taking improper deductions from employees' wages (*id.* at 20); (4) Defendants violated the FLSA overtime provision by failing to pay the overtime premium rate (*id.* at 20-22); (5) Defendants' FLSA violations were willful, and thus a three-year statute of limitations is proper (*id.* at 22-23); (6) Defendants violated the FLSA record keeping provisions (*id.* at 23-24); (7) Defendants owe $10,536.57 in back wages as a result of minimum wage violations (*id.* at 24); (8) Defendants are liable for liquidated damages in an amount equal to the minimum wage and overtime back wages owed (*id.* at 24-26); and (9) injunctive relief barring Defendants from committing future FLSA violations (*id.* at 26-27).

For the following reasons, the Government's motion is granted in part, and Defendants' motion is denied.

FLSA Scope

Sayed moves for judgment on all claims on the basis that he is not an "employer" per the FLSA and therefore cannot be held individually liable. (Doc. 40, at 5-6). The Government opposes and moves for summary judgment on the same issue, contending Sayed exerted significant operational control over Wireless Boys, which functioned for his sole profit. (Doc. 42, at 19). The Government also moves for judgment on Wireless Boys' status as a covered entity under the FLSA. *Id.* at 18. For the reasons that follow, the Court finds Sayed and Wireless Boys are joint employers for FLSA purposes.

*Enterprise*

The Government argues Wireless Boys is a covered enterprise under the FLSA. *Id.* Defendants do not contest this. *See* Doc. 44. "Coverage under the FLSA can be established by showing either (1) enterprise coverage or (2) individual coverage. Enterprise coverage exists where an employer's 'annual gross volume of sales made or business done is not less than $500,000.'" *Gilbo v. Agment, LLC*, 831 F. App'x 772, 774 (6th Cir. 2020) (citing 29 U.S.C. § 203(s)(1)(A)(ii)). Sayed admitted that during the years 2017, 2018, 2019, and 2020, the gross annual sales of Wireless Boys exceeded $500,000. (Sayed Depo., at 89, Requests for Admissions No. 1).

Therefore, Wireless Boys is a covered enterprise for the purposes of the FLSA.

*Employer*

The parties filed cross-motions for summary judgment on Sayed's status as a covered "employer" for purposes of the FLSA.

Under the FLSA, "'[e]mployer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee[.]" 29 U.S.C. § 203(d). "Whether a party constitutes an employer is a legal determination." *Larson v. Leading Edge Outsourcing, Inc.*, 2010

8

U.S. Dist. LEXIS 30129, *21 (M.D. Tenn.). In determining who falls under the definition of "employer", the Sixth Circuit utilizes the "economic reality" test. *See Diaz v. Longcore*, 751 F. App'x 755, 758 (6th Cir. 2018). "This test extends FLSA 'employer' liability to individuals who are chief corporate officers of the business, have a significant ownership interest in the business, control significant aspects of the business's day-to-day functions, and determine employee salaries and make hiring decisions." *Id.*

"In the Sixth Circuit, being the 'top man' at a corporation that functions for an individual's profit is sufficient to impose FLSA liability. This is true even when an individual employer alleges that other, lower members of management made day-to-day operational decisions." *Hatmaker v. PJ Ohio, LLC*, 2019 U.S. Dist. LEXIS 50403, *11-12 (S.D. Ohio) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1998)). In *Parks v. Central USA Wireless, LLC*, the court described the "top man" as "the head of the snake" and as "the member with 'ultimate authority'" within a corporate organizational structure. 2019 U.S. Dist. LEXIS 167502, *12 (S.D. Ohio).

Sayed's role at Wireless Boys is in dispute. Defendants rely on the deposition testimony of Schaefer and Sayed to show Sayed lacked operational control over Wireless Boys, and thus was not an employer under the statute who could be held liable for violations of the FLSA. (Doc. 40, at 18-19). Sayed testified he only hired the managers (Kent, Rideout, and Schaefer) and was not involved in the hiring and firing of other employees. (Sayed Depo., at 15-16). He also testified managers were only required to seek his approval for major financial decisions, such as the purchase of $5,000 speakers. *Id.* at 20. The managers controlled the standard day-to-day operations. *Id.* Further, Sayed did not make any decisions regarding pay deductions (*id.* at 24), he did not oversee payroll or product inventory (*id.* at 30-31), and he never set employee schedules

(*id.* at 38). Schaefer's testimony supports Sayed's description of his involvement in Wireless Boys' operations. *See, e.g.,* Schaefer Depo., at 18, 20, 22.

The Government cites Sayed's testimony, responses to requests for admission, ownership interest in Wireless Boys, and employee witness statements, which all, the Government argues, show Sayed is an "employer" for FLSA purposes. *See* Doc. 48, at 11-12.

Defendants challenge the admissibility of the employee statements, which as discussed *supra*, state Sayed hired employees, directed work, controlled Wireless Boys' hiring and firing decisions, approved deductions from employee paychecks, and that all decisions had to be approved by Sayed. (Doc. 41-2, at 95-96). The employee statements are handwritten accounts recorded by Spader and are purportedly signed by the interviewees. (Spader Depo., at 80-81). The employees' names and signatures are redacted. *Id.* at 80. The Government argues the employee statements contain "information [] sufficient to show the violations and factual assertions made by those giving statements" and further, that this Court held "Defendants' request for an unredacted investigation file . . . in abeyance until the conclusion of dispositive motion practice", and thus, the Government has no duty to provide the unredacted employee statements. (Doc. 46, at 4).

"The DOL cannot hide behind the informants' privilege and prevent the disclosure of interview notes and then choose to include declarations authored by the same interviewees in support of a motion for summary judgment." *Martin v. New York City Transit Auth.*, 148 F.R.D. 56, 64 (E.D.N.Y. 1993). In *Scalia v. G.E.M. Interiors, Inc.*, the Southern District of Ohio reasoned that "[c]ourts contemplate that the privilege will be lost once the informant/informer provides sworn testimony, either by way of an affidavit or declaration in support of a motion for summary judgment, or as a witness at trial." 2021 U.S. Dist. LEXIS 185082, *20 (S.D. Ohio). This Court is persuaded by *Martin* and applies those principles to the instant cross-motions for summary

10

judgment; the Government may not rely on unsworn employee statements which contain redacted signatures to prevail on summary judgment. Informer's privilege does not obviate the Government's burden to produce admissible evidence. And "[t]he fact that the unsworn transcripts were produced during discovery does not cure the fact that they contain inadmissible hearsay." *Beans v. City of Massillon*, 2016 U.S. Dist. LEXIS 180335, *17 (N.D. Ohio). *See also Tenneco Auto. Operating Co. v. Kingdom Auto Parts*, 410 F. App'x 841, 848 (6th Cir. 2010) ("the hearsay affidavit could not be considered and the unsworn statements must be disregarded because a court may not consider unsworn statements when ruling on a motion for summary judgment") (internal citation omitted). Therefore, the Government is not permitted to rely on the unsworn witness statements for purposes of summary judgment.

The Government argues that "Sayed [] admitted to all facts necessary to establish he is an employer under the FLSA [even] without regard to employee statements." (Doc. 48, at 12). The Court agrees. Defendants admitted that "[d]uring the period of March 1, 2017 through the present, Defendant Basam A. Sayed was involved in establishing, determining, implementing or approving Defendants' policies regarding the compensation of employees of Defendant Wireless Boys." (Doc. 47, at 104, Requests for Admissions No. 10). Although Sayed delegated much of the day-to-day operations to the managers, the record shows Sayed is the "top man" and maintained ultimate authority within Wireless Boys' organizational structure. *See Parks*, 2019 U.S. Dist. LEXIS 167502, at *12. Sayed hired and negotiated the salaries of the managers. (Sayed Depo., at 14-15). His approval was required for large expenditures such as air conditioner repairs and other purchases. *Id.* at 20; (Schaefer Depo., at 20). Sayed negotiated contracts at the inception of the business with Sprint and the master agent. (Sayed Depo., at 25). A "general handbook" was also created with Boost Mobile. *Id.* at 22-23. Those contracts set policies for employees which included

11

commissions. *Id.* The initial contracts and guidelines were then enforced by the managers. *Id.* at 22-23. Sayed also had a role in payroll, although it was limited. The managers sent Sayed the final payroll total, Sayed would confirm the Wireless Boys' account contained sufficient funds, and then approve payroll. *Id.* at 26. Sayed is also the sole owner of Wireless Boys. *Id.* at 10.

In *Parks*, the court concluded that a defendant, Hildebrandt, was a joint employer where he was the chief executive officer and sole member of an LLC operating for his profit even where he was not involved in the hiring and firing of employees and did not manage or oversee employees' work or hours. 2019 U.S. Dist. LEXIS 167502, at *10. Although Hildebrandt was not involved in the day-to-day supervision or decision-making regarding employees, he approved compensation structures and had the authority to enter into contracts on the LLC's behalf. *Id.* at *7. The court granted summary judgment in the plaintiff's favor holding Hildebrandt was an employer under the FLSA. *Id.* at *12.

In the case before the Court, the record indicates Sayed established the procedures, compensation structure, and other employee guidelines at Wireless Boys' inception. (Sayed Depo., at 25). Furthermore, he was the only person who could approve major financial decisions and took "care of the banking end" of Wireless Boys' operation. *Id.* at 11. Although managers handled "daily operations", they did so under the guidelines established by Sayed. Sayed had ultimate authority to control Wireless Boys' affairs.

Because "[i]n the Sixth Circuit, being the 'top man' at a corporation that functions for an individual's profit is sufficient to impose FLSA liability. . . even when an individual employer alleges that other, lower members of management made day-to-day operational decisions", *Hatmaker*, 2019 U.S. Dist. LEXIS 50403, at *11-12, the Government is entitled to judgment on Sayed's status as an employer.

12

Minimum Wage and Paycheck Deductions

The parties both seek summary judgment on the alleged minimum wage violations. *See* Doc. 40, at 9; Doc. 42, at 20. The Government argues Defendants failed to pay employees minimum wages for all hours worked by way of unspecified deductions to wages that took some employees' wages below the federal minimum wage of $7.25 per hour of work. (Doc. 42, at 20). Defendants contend all deductions were for permissible purposes. (Doc. 40, at 9). The Court finds genuine issues of material fact remain regarding the deductions.

*Back Wage Computation Exhibit*

Defendants argue the Government is engaged in "trial by ambush" through its use of the "back wage computation exhibit" which purports to show Defendants failed to pay minimum wages. (Doc. 44, at 9). The exhibit, located at ECF Document 41-2, contains spreadsheets "showing the calculation of back wages owed by Defendants ('Back Wage Calculations') as a result of the [alleged] minimum wage and overtime violations found in their payroll and time records." (Doc. 41-1, at ¶ 6). The exhibit is attached to a declaration signed under the penalty of perjury by Spader pursuant to 28 U.S.C. § 1746. The spreadsheets were created using Defendants' payroll records. (Doc. 41-1, at ¶¶ 6, 40).

Defendants contend the spreadsheets were not disclosed in discovery and differ from earlier versions that were produced to Defendants. (Doc. 44, at 9). The Government responds to Defendants' contention of "trial by ambush" as follows:

> In anticipation of her Motion for Partial Summary Judgment, Plaintiff amended the DOL computations for accuracy and consistency. The basis for the computations and the nature of the violations addressed in those computations are unchanged. The updated computations were created for the purpose of summary judgment – Plaintiff did not withhold these computations in discovery. Defendants are now in possession of the most recent set of computations. To avoid confusion, Plaintiff will serve Defendants with a Bates labeled (but unaltered) version of Exhibit 2 to Plaintiff's Motion for Partial Summary Judgment.

(Doc. 48, at 11). The Court does not find the Government's updated computations, which it contends are based on the same payroll records as the spreadsheet that was disclosed to Defendants earlier in this litigation, constitute trial by ambush.

*Deduction Permissibility*

"The FLSA mandates that every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce a statutory minimum hourly wage." *Busk v. Integrity Staffing Sols., Inc. (In re Amazon.com, Inc.)*, 905 F.3d 387, 405 (6th Cir. 2018) (internal quotations omitted). The federal minimum wage is $7.25 per hour. 29 U.S.C. § 206. "Whether in cash or in facilities, 'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35.

Generally, a plaintiff "carries the burden to demonstrate that the defendant-employers are in violation of the [FLSA]." *Herman v. Palo Group Foster Home*, 976 F. Supp. 696, 701 (W.D. Mich. 1997). However, where a defendant-employer fails to maintain adequate and accurate wage and hour records, the burden is allocated as follows:

> Where the employer's records are inaccurate or inadequate . . . an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*United States Dep't of Labor v. Cole Enters.*, 62 F.3d 775, 779 (6th Cir. 1995) (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946)). In *Cole Enterprises*, a case where the DOL brought an action for minimum wage and record keeping violations, the Sixth Circuit held it was

14

proper to shift the burden of proof to the defendant-employer where inaccurate records were kept. *Id.*

29 C.F.R. § 516.2(a)(10) places the following record keeping requirement on employers: "Total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments. Also, in individual employee records, the dates, amounts, and nature of the items which make up the total additions and deductions".

The Government moves for summary judgment arguing "Defendants paid 18 employees an hourly wage of less than $7.25 per hour during the Relevant Period. Defendants made unspecified deductions to wages that took certain employees below the federal minimum wage." (Doc. 42, at 20). The Government contends Defendants violated the FLSA because "[t]he record is devoid of any evidence demonstrating the purpose of these deductions, let alone showing the deductions were justified and/or lawful." *Id.* The Government alternatively argues:

> Defendants admit they made deductions for stolen merchandise, but have failed to produce any evidence demonstrating employees were responsible for the theft. The absence of proof that the merchandise was missing as a result of theft by the employees from whose wages Defendants took the deductions renders said deduction unlawful.

(Doc. 48, at 14).

Defendants contend summary judgment in their favor is proper because the record lacks evidence of impermissible deductions and Schaefer and Sayed both testified that all deductions were for permissible purposes. (Doc. 40, at 9-10). Defendants argue deductions for theft by employees, paycheck advances, loans for gas money, or for merchandise, were all permissible purposes. *Id.* The Government contends the lack of record keeping or other specific evidence, as opposed to the generalized testimony by Schaefer and Sayed that all deductions fell into a permissible category, proves the deductions were unlawful. The Government also argues that

because Defendants did not provide evidence showing the employees were responsible for the theft, any deduction for theft was unlawful.

The Court finds genuine issues of material fact remain. The payroll records do not include information adequate for this Court to gauge whether any or all deductions were permissible, as many deductions were labeled as "miscellaneous". (Spader Depo., at 32); *See e.g.,* Doc. 41-2, at 619. "[A]n employer who makes deductions from the wages of employees for 'board, lodging, or other facilities' . . . shall maintain and preserve records substantiating the cost of furnishing each class of facility" except in limited circumstances not applicable here. 29 C.F.R. § 516.27. Given Defendants have provided no documentary evidence substantiating a significant portion of the deductions, their records are inadequate, "and, consequently, the burden-shifting scheme discussed above applies in this case." *Herman*, 976 F. Supp. at 702.

Defendants' averments are similarly insufficient to warrant summary judgment in their favor. Defendants' generalized testimony that paycheck deductions resulted from "theft by employees, paycheck advances, loans for gas money, or for merchandise" does not establish each deduction was permissible. Deductions for some expenses – such as gas, uniforms, or merchandise – could be permissible in some circumstances and impermissible in others. *Ettorre v. Russos Westheimer, Inc.*, 2022 U.S. App. LEXIS 7295, *9 (5th Cir. 2022) ("And any facility provided that is 'primarily for the benefit or convenience of the employer' is not a reasonable cost").

For example, employees were required to pay for Wireless Boys' branded uniforms. (Schaefer Depo., at 17, 19). Schaefer testified employees had to pay for their uniforms, the cost of which would be deducted from employee paychecks. *Id.* at 17. "An employer may not deduct from employee wages the cost of facilities that primarily benefit the employer if such deductions drive wages below the minimum wage." *Keefe v. Perry's Rests. Ltd.*, 2023 U.S. Dist. LEXIS 88710, *8

16

(W.D. Tex.). Therefore, even in light of Schaefer and Sayed's testimony, genuine issues of material fact remain as to whether which deductions, if any, were permissible under the law.

On the other side, the Government's argument that "absence of proof that the merchandise was missing as a result of theft by the employees from whose wages Defendants took the deductions renders said deduction unlawful" is not a proper application of the law at the summary judgment stage of litigation. (Doc. 48, at 14). Under *Cole Enterprises*, "[t]he burden [] shifts [to] the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the [plaintiff's] evidence." 62 F.3d at 779. Defendants did so here through Schaefer's testimony that deductions for theft only took place where it was the employee who committed the theft. (Schaefer Depo., at 18). The Government does not argue employers may not make deductions from employee paychecks where the employee steals from the employer.

Genuine issues of material fact remain as to whether Defendants committed minimum wage violations, and accordingly, neither party is entitled to summary judgment on this claim.

<u>Overtime Violations</u>

> Under 29 U.S.C. § 207,
>
> no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The Government contends Defendants violated the FLSA overtime wage requirements in five ways: (1) paying straight time for overtime hours worked; (2) calculating overtime compensation based on biweekly pay period rather than workweek; (3) rounding down overtime hours worked by employees; (4) failing to include commissions in employees' regular rates when calculating

overtime compensation owed; and (5) failing to pay salaried employees the overtime premium rate for hours worked over forty in a workweek. (Doc. 42, at 20). On this point, the Government's motion is limited to liability and does not seek back wages at this stage of the proceedings. (Doc. 48, at 17). Defendants argue the records on which the Government relies do not support the Government's arguments or are insufficient to prove violations of the FLSA. (Doc. 44, at 16). This Court finds the Government is entitled to summary judgment, limited to liability, on the FLSA overtime wage claims.

*Straight Time for Overtime Worked*

The Government argues "Defendants failed to pay the overtime premium rate of time and a half to [] employees for hours worked over 40" in a workweek. (Doc. 42, at 21). The Government relies on Defendants' earning records. (Doc. 41, at 120-21). For example, the records show employee Brianne Wilkerson worked 91.22 hours in a two week pay period. *Id.* Her standard rate of pay was $8.75 per hour. *Id.* Wilkerson was paid $798.18 during that period. *Id.* at 11, 120-21. Thus, the records showed she was paid straight time for all 91.22 hours worked, and not paid "one and one-half times the regular rate" for overtime hours worked as required under 29 U.S.C. § 207.

Defendants argue these records were not produced in discovery and fail to identify an employee and thus could refer to anyone. (Doc. 44, at 15-16). Defendants' argument is not well taken; the records identify Brianne Wilkerson, are properly attached to Spader's declaration, and rely on Defendants' own records. (Doc. 41, at 120-21).

The Government has shown Defendants engaged in an unlawful practice – as demonstrated by the example of Wilkerson – by paying straight time wages for overtime hours worked. Defendants have not created an issue of material fact about that unlawful practice, but rather attack the substance and admissibility of the evidence presented by the Government. Therefore, the

Government is entitled to summary judgment because Defendants did not "present affirmative evidence in order to defeat [the Government's] properly supported motion for summary judgment." *See Anderson*, 477 U.S. at 257.

*Biweekly Calculation*

The Government argues Defendants are liable for overtime violations "by only paying the overtime premium rate for hours worked over eighty in a two week pay period, rather than over forty in a workweek." (Doc. 42, at 21). The Government cites time sheet and earning records attached to Spader's declaration. (Doc. 41, at 11-12, 122-26). The records show employee Robert Evens worked 81.27 hours over a two week pay period. *Id.* at 122. During that period, Evens worked 45.85 hours during the first week, and 35.42 during the second week. *Id.* Evens therefore worked 5.85 overtime hours during the first week. The earnings record shows he was only credited with 1 overtime hour worked over the two week pay period. *Id.* at 124.

Federal regulations expressly state each workweek must stand alone, stating:

The Act takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks. Thus, if an employee works 30 hours one week and 50 hours the next, he must receive overtime compensation for the overtime hours worked beyond the applicable maximum in the second week, even though the average number of hours worked in the 2 weeks is 40.

29 C.F.R. § 778.104. By averaging Evens' hours over a two week pay period, Defendants misclassified overtime hours worked during the first week as straight-hour wages.

The Government has demonstrated – citing Evens' records as an example – Defendants' unlawful practice of averaging hours over a two week pay period instead of classifying overtime hours on a weekly basis as required under the applicable regulations. Defendants attack the validity of the evidence relied upon by the Government, but fail to create an issue of material fact regarding the unlawful practice. Because the Court finds the evidence cited by the Government is properly

before the Court, there is no genuine issue of material fact, and the Government is accordingly entitled to judgment limited to liability.

*Rounding Overtime Compensation Down*

The Government argues Defendants' practice of rounding down employees' overtime hours worked was impermissible under the FLSA. Defendants contend the records the Government relies on "are a hodge podge of different documents and do not support DOL's assertions", the Government "fails to identify any employee that this rounding error allegedly occurred", and that one employee referenced in Spader's declaration, Dustin Moore, was paid properly. (Doc. 44, at 16).

Applicable federal regulations permit the practice of rounding "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48. An employer which always rounds hours worked to the disadvantage of employees, and therefore fails to average out for all the time employees actually work, violates the FLSA. *See e.g., Lacy v. Reddy Elec. Co.*, 2013 U.S. Dist. LEXIS 97718, *37 (S.D. Ohio) ("A policy that always rounds up to the scheduled start time, regardless of when an employee logs in, fails in that respect. The Court therefore agrees that this portion of the rounding policy is facially defective as a matter of law.").

The Government relies on the Spader declaration wherein two instances of rounding are discussed: Dustin Mason's hours were rounded down from 7.45 to 7.00, and Robert Evens' hours were rounded down from 1.27 to 1.00. (Doc. 41, at 12). The regulations permit "recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour", so long as rounding does not result in employees' improper compensation over a period of time. 29 C.F.R. § 785.48. The two examples show Defendants rounded down from

both a quarter-hour and nearly half-hour to only an hour of compensation. The regulations do not contemplate such large reductions as permissible rounding practices. *Id.* (recognizing employment practice of rounding to the nearest 5-minutes, tenth of an hour, or quarter of an hour). The Court therefore agrees with the Government that Defendants unlawfully rounded employee hours downwards.

*Commissions*

The Government contends Defendants failed to include commissions in employees' regular rate of pay when computing and paying overtime compensation for hours worked over 40 in a workweek. Relying on Spader's declaration, the Government highlights employee Katelynn Barnier's earnings during the pay periods ending September 29, 2019, and October 13, 2019. (Doc. 41, at 12). The records show Barnier's commissions were not included in her regular rate of pay when calculating overtime compensation. *Id.* at 127. Defendants argue the cited records do not refer to Barnier, there are no pay periods that end on September 29, 2019 or October 13, 2019, and that any identified failure is nevertheless meaningless because Spader's methodology in calculating the payments was improper. (Doc. 44, at 17). Defendants do not direct this Court to any evidence which shows commissions were included in employees' regular rate of pay. *See id.*

The applicable federal regulation requires commission payments be included in the regular rate of pay:

> Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate. This is true regardless of whether the commission is the sole source of the employee's compensation or is paid in addition to a guaranteed salary or hourly rate, or on some other basis, and regardless of the method, frequency, or regularity of computing, allocating and paying the commission. It does not matter whether the commission earnings are computed daily, weekly, biweekly, semimonthly, monthly, or at some other interval. The fact that the commission is paid on a basis other than weekly, and that payment is

21

delayed for a time past the employee's normal pay day or pay period, does not excuse the employer from including this payment in the employee's regular rate.

29 C.F.R. § 778.117.

Defendants' arguments are not well taken. The earnings record expressly identify Barnier as the employee. (Doc. 41, at 126-27). It further identifies October 3, 2019 and October 17, 2019 as dates paychecks were issued. *Id.* Spader's reference to pay periods ending on September 29, 2019 and October 13, 2019 is consistent with pay checks issued four days later. Furthermore, Defendants flatly mischaracterize Spader's testimony as an admission his methodology was improper. (Spader Depo., at 46-47). Defendants also argue commissions are always paid in arrears but cite no evidence to support their position. (Doc. 44, at 17).

There is no genuine dispute of material fact that Defendants failed to include commissions in employees' regular rate of pay. The Government therefore is entitled to judgment in its favor, limited to liability, on this issue.

*Salaried Workers*

The Government argues Defendants paid salaried employees straight time for overtime hours worked. (Doc. 42, at 20). Defendants contend the Government's evidence does not show the violations the Government claims and that salaried employee are exempt from the overtime requirements set forth in the applicable FLSA provision. (Doc. 44, at 17-18).

The evidence in contention consists of the earnings record and time sheets of employee Jacob M. Cromer. (Doc. 41, at 128-30). The earnings record show Cromer's regular pay was $1,000 per pay period, amounting to $500 per week. *Id.* at 128-29. He also earned commissions. *Id.* The earnings report shows Cromer was paid $1,000 biweekly from January 24, 2019, to May 2, 2019. *Id.* at 128. However, Cromer is listed as working "0.00" hours per pay period (*id.*), suggesting Cromer was paid a set salary. Cromer's time sheets show that during the April 16, 2019,

22

to April 20, 2019, workweek, he worked 51.93 hours. *Id.* at 13, 130. The Court finds Defendants' contention the evidence shows Cromer worked and was paid for 40 hours per week to be inconsistent with the evidentiary record, and accordingly rejects this defense.

Defendants also refer to Cromer as a salaried exempt employee. (Doc. 44, at 17). Overtime exemptions are "construe[d] . . . narrowly against the employer seeking to assert it, and the employer bears the burden of proof on each element of the claimed exemption." *Bowers v. NOL, LLC*, 114 F. App'x 739, 741 (6th Cir. 2004). Maximum hour requirement exemptions are codified at 29 U.S.C. § 213.

"Employers may pay their employees on a salaried basis. However, the law may require an employer to pay overtime wages to a salaried employee." *Vaughan v. Youngblood Excavating & Contr., LLC*, 2015 U.S. Dist. LEXIS 162650, *5 (W.D. Ky. 2015). "To satisfy their burden of proof, defendants generally must identify the specific exemption they wish the court to apply to their case." *Williams v. Hooah Sec. Servs. LLC*, 2011 U.S. Dist. LEXIS 133412, *32 (W.D. Tenn.). For example, 29 U.S.C. § 213 carves out an exemption for "employee[s] employed in a bona fide executive, administrative, or professional capacity . . . or in the capacity of outside salesman[.]" Once an employer identifies which exemption it wishes the Court to apply, it is the employer's burden to provide proof the employee meets every element of that exemption. *Bowers*, 114 F. App'x at 741. If an employer chooses to proceed under the administrative exemption, for example, it must show the employee is: (1) [c]ompensated on a salary or fee basis at a rate of not less than $455 per week [;] (2) [w]hose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) [w]hose primary duty includes the exercise of discretion and

23

independent judgment with respect to matters of significance." *Lutz v. Huntington Bancshares, Inc.*, 815 F.3d 988, 992 (6th Cir. 2016).

Defendants do not alert this Court to any specific exemption which applies to Cromer, and therefore have not raised a genuine issue of material fact that he was an employee exempt from the maximum hour requirements found in 29 U.S.C. § 207. The Government is entitled to judgment, limited to liability, accordingly.

Record Keeping

Defendants move for judgment on the Government's record keeping claim and argue they "maintained all the data that was required under" 29 U.S.C. § 211. The Government moves for judgment and argues Defendants "failed to maintain records of weekly hours worked for all employees" in violation of 29 U.S.C. § 211(c) and 29 C.F.R. §§ 516.2, 516.5.

The Government relies on Spader's declaration, which states "Defendants failed to maintain records of weekly hours worked. In particular, Defendants failed to produce documents reflecting weekly hours worked for the period prior to June 2018." (Doc. 41, at 14). Defendants cite Spader's deposition testimony wherein he stated data obtained from the computerized point of sale ("POS") system could be used to determine total weekly hours. (Spader Depo., at 56-57). Spader testified he used the data to determine total weekly hours for Defendants' employees. *Id.*

Covered employers must comply with the following record keeping requirements:

Every employer subject to any provision of this Act or of any order issued under this Act shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator [Secretary] as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this Act or the regulations or orders thereunder.

29 U.S.C. § 211(c). Additionally, 29 C.F.R. § 516.2 relevantly states:

24

> Every employer shall maintain and preserve payroll or other records containing the following information and data with respect to each employee to whom section 6 or both sections 6 and 7(a) of the Act apply:
>
> * * *
>
> (7) Hours worked each workday and total hours worked each workweek (for purposes of this section, a "workday" is any fixed period of 24 consecutive hours and a "workweek" is any fixed and regularly recurring period of 7 consecutive workdays)

And 29 C.F.R. § 516.5 requires payroll records be preserved for 3 years. "The Act requires no particular form for the records, but does require that the records include certain identifying information about the employee and data about the hours worked and the wages earned." *Solis v. Aguilar*, 2009 U.S. Dist. LEXIS 87021, *28 (M.D. Tenn.).

A genuine dispute of material facts remains as to whether Defendants maintained adequate records showing total hours worked each week. Spader testified in July 2022 that the data necessary to ascertain each employees' weekly hours worked was available. (Spader Depo., at 57-58). Spader testified that the records were inadequate because they "did not provide the total weekly hours", but the Government does not cite any authority supporting this position; if Defendants' computerized system recorded the data necessary to determine each employees' weekly hours worked, then there is no violation of the applicable 29 U.S.C. § 211(c) provision.

In April 2023, Spader stated in his declaration that "Defendants failed to produce documents reflecting weekly hours worked for the period prior to June 2018." (Doc. 41, at 14). However, given Spader's prior testimony on this subject, it is unclear whether no records prior to 2018 exist, or if Defendants were unable to produce such records without consulting ADP (the POS system Defendants used). Both Sayed and Schaefer testified that Rideout, a former manager, stole or destroyed Defendants' records. (Schaefer Depo., at 35-36); (Sayed Depo., at 50-51).

However, because Defendants used a computerized POS system, wage and hour data was recoverable. (Spader Depo., at 56).

Because a genuine issue of material fact remains on the preservation of pre-2018 wage and hour data, the parties' competing motions are denied on this claim.

<u>Willful Violations</u>

Under 29 U.S.C. § 255, the statute of limitations "for unpaid minimum wages, unpaid overtime compensation, or liquidated damages" is two years. However, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued[.]" *Id.*

Defendants contend the statute of limitations is two years because Spader was unable to point to evidence showing any violation of the FLSA was willful. (Doc. 40, at 8). The Government argues the statute of limitations is three years because Sayed and a company he previously owned, Haverhill, were previously investigated for minimum wage and overtime violations. (Doc 42, at 23).

Sayed testified he and Haverhill were investigated for overtime violations in either 2017 or 2018, and that he was ultimately found not liable. (Sayed Depo., at 42-43). A consent judgment was entered against Haverhill which permanently enjoined and restrained it from violating the provisions of the FLSA. (Doc. 41, at 103-07). The Court takes judicial notice of the *U.S. Department of Labor v. Haverhill Petroleum, LLC et al.*, 17 CV 2031 (N.D. Ohio) docket, and notes Sayed was dismissed from that case on March 1, 2019. Fed. R. Evid. 201.

In *McLaughlin v. Richland Shoe Company*, the Supreme Court held "[t]he standard of willfulness . . . that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute – is surely a fair reading of the plain language of

the [FLSA]." 486 U.S. 128, 133 (1988). "When, for example, the defendant has been put on notice of potential FLSA violations by a previous lawsuit and continues to engage in the same conduct without investigation into the allegations, a reasonable jury could find that the defendant's conduct is willful." *Crowell v. M Street Ent., LLC*, 2023 U.S. Dist. LEXIS 71770, *82 (M.D. Tenn.).

This Court is persuaded by the reasoning of *Crowell*. In that case, the district court held a reasonable jury could find the defendants were put on notice for failure to pay overtime wages by way of an earlier lawsuit alleging, *inter alia*, minimum wage and overtime violations. *Id.* at *84. Subsequently, the Department of Labor filed suit alleging similar violations of the FLSA. *Id.*

In this case, Sayed testified the Haverhill investigation was about the "[s]ame thing" as the investigation into Wireless Boys. (Sayed Depo., at 42). "The prior lawsuit at least arguably put the [D]efendants on notice of specific potential violations of the FLSA." *Crowell*, 2023 U.S. Dist. LEXIS 71770, at *87.

Accordingly, a genuine issue of material fact remains on whether Defendants willfully violated the FLSA, and the parties' competing motions for judgment on the statute of limitations issue are denied.

Back Wages and Liquidated Damages

The Government moves for back wages in the amount of $10,536.57. (Doc. 42, at 24). The source of these owed back wages, the Government argues, "result[ ] from Defendants' minimum wage violations[,]" (*id.*), and expressly states it does not seek back wages, at this time, for overtime wage violations (Doc. 48, at 17). The Government also moves for liquidated damages "for Defendants' minimum wage and overtime violations[.]" (Doc. 42, at 26).

The Court finds genuine issues of material fact remain as to alleged minimum wage violations, and therefore presently denies the Government's request for back wages in accordance with that finding.

Under 29 U.S.C. § 216,

(b) [] Any employer who violates the provisions of section 6 or section 7 of this Act [29 USCS § 206 or 207] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.

In *Hall v. Cocke County*, the Sixth Circuit explained,

[a]n employer who violates the FLSA is liable not only for compensatory damages but also for liquidated damages equal to compensatory damages. 29 U.S.C. § 216(b). However, a court may, in its discretion, award a lesser sum, or deny liquidated damages altogether, if the employer satisfies the court that the act or omission giving rise to liability was in good faith and that he had reasonable grounds for believing that the act or omission was not a violation of the FLSA.

1991 U.S. App. LEXIS 19050, *8 (6th Cir.).

Because the Government has not provided the necessary evidence to determine the amount owed to employees as a result of Defendants' overtime violations, the Court withholds judgment on this issue. *Prince v. Kansas City Tree Care, LLC*, 2023 U.S. Dist. LEXIS 39948, *17 (D. Kan.) ("In addition to compensatory damages for any statutory violations, FLSA plaintiffs can recover an equal amount as liquidated damages[.]").

Injunctive Relief

The Government requests injunctive relief against Defendants to prevent future violations. (Doc. 42, at 26-27).

Under 29 U.S.C. § 217, "[t]he district courts . . . shall have jurisdiction, for cause shown, to restrain violations of section 15 [29 USCS § 215], including in the case of violations of section 15(a)(2) [29 USCS § 215(a)(2)] the restraint of any withholding of payment of minimum wages

28

or overtime compensation found by the court to be due to employees under this Act[.]" "The purpose of issuing an injunction against future violations is to effectuate general compliance with the Congressional policy of abolishing substandard labor conditions by preventing recurring future violations." *Reich v. Petroleum Sales*, 30 F.3d 654, 656 (6th Cir. 1994) (quoting *Martin v. Funtime, Inc.*, 963 F.2d 110, 113-14 (6th Cir. 1992)).

"The issuance of an injunction under the Fair Labor Standards Act is addressed to the reasonable discretion of the trial judge." *Id.* (quotations omitted). "[A] district court, in exercising its discretion, should consider: (1) the previous conduct of the employer; (2) the current conduct of the employer; and (3) the dependability of the employer's promises for future compliance." *Id.* at 657.

Given that one of the factors a district court should consider in weighing whether injunctive relief is warranted is "the current conduct of the employer", the Court reserves judgment on injunctive relief until the remaining claims, minimum wage and record keeping violations, are adjudicated.

CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendants Wireless Boys, LLC, and Basam A. Sayed's Motion for Summary Judgment (Doc. 40) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that the United States Department of Labor's Motion for Summary Judgment (Doc. 42) be, and the same hereby is, GRANTED in part as to overtime wage violation liability, and DENIED in part as to all other claims.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

29
